**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

| | |
|---|---|
| **CHERI RUSS**, an individual, and **JUDITH JOHNSON**, an individual, | **CIVIL ACTION** |
| Plaintiffs, | **Case No.   2:20-cv-484** |
| v. | **Judge:** |
| **THE SCHOOL BOARD OF LEE COUNTY, FLORIDA**, a political subdivision of the State of Florida, | **Mag. Judge:** |
| Defendant. | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

**NOW COME** the Plaintiffs, **CHERI RUSS** ("RUSS"), and **JUDITH JOHNSON** ("JOHNSON")(collectively "Plaintiffs"), by and through undersigned counsel, and bring this action against The School Board of Lee County, Florida ("Defendant") and state the following for their Complaint:

## INTRODUCTION

1.     This is an action brought under the federal False Claims Act (FCA) and Florida's Public Whistleblower Act (PWA) for (1) retaliation in violation of the FCA, and (2) retaliation in violation of the PWA.

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331.

1

3.      This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in the United States District Court for the Middle District of Florida because the Plaintiffs worked in, and the Defendant conducts business in, and some or all of the events giving rise to Plaintiffs' claims occurred in Lee County, Florida, which is within the Middle District of Florida. Venue is proper in the Fort Myers Division under Local Rule 1.02(b)(5) since Lee County is within the Fort Myers Division.

## PARTIES

5.      Plaintiff, **CHERI RUSS** ("**RUSS**") is an individual and a resident of Florida who at all material times resided in Lee County, Florida and was employed by the Defendant in Lee County, Florida.

6.      Plaintiff, **JUDITH JOHNSON** ("**JOHNSON**") is an individual and a resident of Florida who at all material times resided in Lee County, Florida and was employed by the Defendant in Lee County, Florida.

7.      Defendant, **THE SCHOOL BOARD OF LEE COUNTY, FLORIDA** ("School" or "Defendant") is a political subdivision of the state of Florida and oversees the public school system in and for Lee County, Florida. The Defendant was Plaintiffs' employer.

## GENERAL ALLEGATIONS

8.      **RUSS** began her employment with the Defendant in June 2011.

9.      On April 6, 2014, the Defendant promoted **RUSS** to the position of internal auditor.

10.     **JOHNSON** began her employment with the Defendant in July 2016.

11.     In their respective positions, the Plaintiffs observed a litany of illegal conduct by the Defendant.

12.     On November 3, 2018, **RUSS** began investigating why the Pell Grant checking account for FMTC was overdrawn and why the majority of the Pell disbursement spreadsheets were filled out incorrectly, and not balanced yet still signed off on by the Senior Directory of the school, Mr. Brian Mangan. The Defendant's Pell checking account had to "borrow" $10,000 from the FMTC checking account in order to cover the shortage of funds.

13.     In December 2018, **JOHNSON** began assisting **RUSS** by providing training to the FMTC finance, data, and administrative teams regarding procedures for managing student accounts in the FOCUS student information management system.

14.     In December 2018, the Defendant was called to a meeting with the then-CFO, Mr. Greg Blurton and others in which Mr. Brian Mangan agreed to put his assistant director, Mr. George McDaniel in charge of correcting student ledgers over the Christmas break.

15.     In January 2019, **JOHNSON** sent written communication to Mr. Mangan to advise that she spot checked the student ledgers to review the work done over the Christmas break and that they were still incorrect. She also asked Mr. Mangan to meet to review his student account ledgers.

16.     Also, in January 2019, **JOHNSON** also reviewed student accounts and made notification they were still incorrect.

17.     In March 2019, **RUSS** issued her first report regarding the Pell Grant issues at FMTC, which was highly critical of FMTC's management.

18.     In April 2019, the Defendant appointed **JOHNSON** as the interim senior director of FMTC.

19.     On April 22, 2019, the U.S. Department of Education contacted the Defendant regarding FMTC and the audits the Plaintiffs were conducting.

3

20.     On April 24, 2019, Mr. Mangan and George McDaniel were removed from FMTC and placed on suspension pending investigation for mismanagement and misappropriation of state and federal funds. **JOHNSON** was then appointed as interim senior director.

21.     On April 29, 2019, the Plaintiffs had a meeting at FMTC to plan the next steps for an internal audit of all student account ledgers, payment, and financial aid disbursements, for the 18/19 school year.

22.     In June 2019, the Defendant created a new position at FMTC titled "business process analyst," which **RUSS** was urged to – and did – apply for.

23.     **RUSS** accepted the position at FMTC on June 20, 2019, while also retaining her duties of an auditor.

24.     In July 2019, **RUSS** continued to conduct an audit of FMTC, which investigation centered upon overdrawn Pell Grants and various other business practices.

25.     **RUSS**' findings were highly critical of Todd Everly, who was the director of PSA. These findings included, but were not limited to, the following:

- The process for monthly reconciliation between financial aid and student accounts did not exist at the school which is in violation of Department of Education Federal Student Aid Guidelines (as described in the FSA Guidebook, Volume 4, Chapter 5);

- The overall process for handling student accounts and financial aid has not been documented;

- The turnover at the location and lack of training had compounded the problem;

- Federal Pell funds had been incorrectly applied to student accounts in FOCUS often times resulting the school holding more Pell funds back from the student than proper;

- VA awards were not applied to a student account in a timely fashion resulting in refunds needing to be issued to students when the VA funds were finally deposited in the FMTC checking account. VA funds are deposited in the

FMTC checking account and when it is determined the funds are for a PSA student, FMTC must write a check to PSA so they can apply the funds to the student ledgers. There is a delay in this process which needed to be addressed;

- Student Ledgers are not reliable and a full student population review needs to be conducted, not only for the current year, but also prior years. Postings to student accounts must be recorded correctly for the ledgers to show posted charges and payments accurately;

- Scholarships, Career-Source grants and other funding sources were not being applied to student accounts in FOCUS in a timely manner, therefore Pell awards and disbursements were often incorrect. Also, no reconciliation process existed;

- Not all charges were entered into the student ledgers (application fees, tools, books, etc.) or there had been other disbursements recorded twice in FOCUS, over/understanding the students 1098-T reports;

- FY17 1098-T forms were missing some information, therefore making them incorrect;

- Career-Source, according to FOCUS, at the time, owed the Defendant over $120,000, however due to the incorrect database data and students not being deferred to Career Source until later, that number may be higher. Some of the money owed is for students who attended as far back as 2016. Individual invoice review will need to be done to determine what the payment status may be. It is possible FOCUS is incorrect and some of those payments have been received.

- A review of Student Ledgers vs. Student Schedules found that some students were attending classes or had graduated from the programs without ever being billed for one or more semesters. A billing calendar did not exist at the school until April 2019, when JOHNSON was named interim senior director at FMTC. Student ledger reviews should include billing reviews for courses taken;

- There were discrepancies between the program disclosure sheets which lists the fees charged to students vs what they are actually charged and deducted from Pell awards or other funding sources in FOCUS;

- A funding source titled FMIT MISC had been used to indicate a scholarship award, however that funding source did not note if it was a "need based" scholarship or not. By not recording the funding sources correctly, the Defendant could be losing out on Federal Perkins funding. Each individual scholarship should have its own funding source and "MISC" should never be used;

- A review of Financial Aid codes by JOHNSON and RUSS, that are used to calculate the Perkins funding amount for each school, showed they were not accurately marked on each student record. JOHNSON directed FMTC and PSA to review current students to ensure the codes were corrected. PSA had set their deadline for this to be May 30, 2019. RUSS did not know if FMTC had a deadline set by prior management. PSA had put a process document in place for who should originally be marking the codes on their campus. FMTC needed to do the same;

- Scholarship criteria should exist for all scholarships available on all campus'. A folder must exist for each scholarship that would include award criteria, who developed the scholarship, what stipulations exist for each, and if a committee is needed to determine awards – who is on that committee and why. Award letters should be included in the folders;

- According to Financial Aid and FMTC, the Cost of Attendance (COA as reported on the schools website) has not been reviewed in at least 5 years, however this should be reviewed and updated yearly;

- DCF students were not always identified and it was been found that some were charged for courses they had waivers for. A DCF process needs to be put in place;

- Dual Enrollment students – Grade 30. It was found that Dual Enrollment student charges were reduced to zero or not charged at all. The school should have been deferring charges to a Dual Enrollment funding source and then billing the School District for those student fees.

- A process needed to be documented for book and uniform vouchers that are given out to students by financial aid and/or Career Source. Oftentimes it was found the school would pay the bill from the book or uniform company and then not bill the funding source (usually Career Source);

- The financial aid master spreadsheet needed to be updated to include the Career Source award amount in order to ensure over-funding is not happening. This needed to be done for Voc-Rehab as well;

- The financial aid master spreadsheet needed to be reconciled with the student ledger postings, and;

- There is a Grainger scholarship held in the school's internal fund. It was told to Plaintiff that Grainger allows them to use that money for whatever they want. Financial Aid staff at FMTC told Plaintiff it was Mr. McDaniel who decided what to do with that money.

26.     On June 18, 2019, **RUSS** completed the internal audit of the PSA as part of her internal audit position and issued one finding to the school for inaccurate student ledgers which upset Mr. Everly.

27.     On July 23, 2019, **JOHNSON** provided a written update of the internal ledger review to the Defendant's chief financial officer.

28.     In August 2019, the Plaintiffs discovered that fee disclosure statements for PSA were out of compliance with district and state guidelines. Specifically, the Plaintiffs' investigation uncovered misappropriation regarding tuition fees and sales tax, which were reported in writing to the Defendant's CFO. Again, Mr. Everly was angry and demanded **RUSS** be disciplined, in addition to pulling all PSA projects from her even though she was hired to support the changes that needed to be made at FMTC, CCTC and PSA.

29.     On August 16, 2019, **JOHNSON** discovered that the Defendant, specifically the PSA under the direction of Todd Everly, had not set up students' schedules to accurately reflect the actual dates and times the students were attending the classes/courses. In addition, **JOHNSON** observed that the Defendant had systematically scheduled  students for 10-hour days, when students are actually only attending class for 9-hours per day. The Defendant explained that employees needs to "fudge" the FOCUS schedules to make them match up with the number of hours on their spreadsheets used to manually schedule students. **RUSS** explained to the Defendant that the FOCUS system is used to report data directly to the FLDOE WDIS system, for State Workforce funding, Federal Financial Aid/Pell and VA disbursement calculations, and to the Defendant's outside agencies that sponsor their students. **JOHNSON** was adamant that the Defendant cannot over-report instructional hours.

30.     **JOHNSON** sent a follow-up email to the Defendant to recap the discussion and the training provided at the meeting on August 20, 2019. When asked if the Defendant could just go back and fix the previous year's inaccurate schedules, **JOHNSON** responded that that year's data has been locked and certified by the superintendent and was no longer available for edit. She also shared with Mr. Everly that the over-reported hours were likely to come up in an audit by the state auditor and would likely result in a finding that could cause the Defendant to return workforce funds to the state and cause findings with federal financial aid awards to students.

31.     On September 17, 2019, **RUSS** sent an email to the Defendant's CFO in response to comments made to her about "friction" between JOHNSON and Mr. Everly. **RUSS** detailed the three major issues **RUSS** and **JOHNSON** had found in their review of the Public Service Academy, which was under the leadership of Todd Everly.

32.     Notwithstanding the above, on or about September 24, 2019, the Defendant promoted Todd Everly to the position of senior director, which Everly became the Plaintiffs' supervisor.

33.     On October 4, 2019, the Plaintiffs' student ledger review was sent to the Defendant, which documented that 55% of ledgers were incorrect or needed correction, 81% were corrected or verified by the audit team, 94% of the incorrect ledgers were for students receiving financial aid, over $23,000 was still owed to students, over $36,000 was uncollectible due to students not being invoiced or fees not collected, and over $5,800 was due back to the funding sources.

34.     On October 10, 2019, after demoting **JOHNSON** back to Director from Interim Senior Director, the Defendant advised **JOHNSON** that she was being removed from her position and reassigned to the district office. **JOHNSON** later learned that this was done as part of a complaint made against her by Mr. Everly.

35.     Also, on October 10, 2019, **RUSS** was informed of disciplinary action against **JOHNSON**, the reassignment of **JOHNSON** and told if she ever spoke to **JOHNSON** again, her career with the Defendant would be over. At the same meeting, Mr. Everly reminded **RUSS** that he would be completing her annual evaluation.

36.     On November 1, 2019, and as part of her compliance and audit duties, **RUSS** reported to Everly wrongdoing that was occurring under his watch, including multiple failures to properly complete compliance documentation as required by law. **RUSS** also provided Everly with written documentation confirming noncompliance with federal Pell Grant awards.

37.     On November 5, 2019, Everly retaliated against **RUSS** by filing a complaint, the immediate result of which was the Defendant removing **RUSS** from her position and placing her on administrative leave.

38.     On March 27, 2020, Everly issued **RUSS** a poor performance review and recommended her contract not be renewed.

39.     The Defendant has kept **RUSS** on administrative leave and re-assigned **JOHNSON** to another position, failing to renew their respective contracts, which expired on June 30, 2020. At that time, they were terminated by the Defendant.

40.     The Plaintiffs performed their assigned duties in a professional manner, was very well qualified for their respective positions, and had not received any discipline whatsoever prior to them suddenly being terminated and/or demoted by the Defendant just days and weeks after they engaged in statutorily protected activity.

41.     As a direct and proximate result of objecting to and filing complaints regarding the Defendant's violations of law, the Defendant subjected the Plaintiffs to adverse employment action, to wit: their respective terminations.

## COUNT I – VIOLATION OF VIOLATION OF 31 U.S.C. § 3730(h): RETALIATION- RUSS

42.     Plaintiff incorporates by reference Paragraphs 1-41 of this Complaint as though fully set forth below.

43.     **RUSS**, an employee, believed in good faith, and a reasonable employee in the same or similar circumstances would also believe, that Defendant was committing a fraud upon federal government agencies and other private entities.

44.     Defendant was aware of **RUSS**' disclosure of its alleged misdeeds to her supervisor and administrators.

45.     Immediately thereafter, **RUSS** began to receive unsatisfactory performance reviews, reprimands, a hostile work environment, and adverse employment action.

46.     Immediately after objecting to Defendant's misdeeds, **RUSS** began to be subjected to retaliation.

47.     Pursuant to 31 U.S.C. § 3730(h) of the False Claims Act (hereinafter "FCA"), any employee who is discharged, demoted, suspended, threatened, harassed and otherwise discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done under the FCA is entitled to all relief necessary to make the employee whole.

48.     The purpose of the FCA, as explained in the Senate report accompanying the 1986 amendments to the FCA, states that Congress added a retaliation provision to the FCA "to halt companies… from using the threat of economic retaliation to silence 'whistleblowers'" and to "assure those who may be considering exposing fraud that they are legally protected from retaliatory acts." S. Rep. No. 99-345, at 34 (1986), U.S. Code Cong. & Admin News 1986, at 5266, 5299.

49.     Defendant began its negative employment actions against **RUSS** and ultimately did discharge her from her position for reasons contrary to public policy, as set out in 31 U.S.C. § 3730(h) and without just cause.

50.     Defendant, in discharging, suspending, demoting, threatening, disciplining and harassing **RUSS** in and from her employment, retaliated and discriminated against her because of complaints and concerns raised by her to Defendant.

51.     The acts of Defendant in demoting, suspending, threatening, disciplining, harassing, discriminating, and retaliating against **RUSS**, including but not limited to the wrongful discharge of employment, adverse employment actions, denial of true and correct performance appraisals, demotion and termination of **RUSS** by Defendant violated the provisions of 31 U.S.C. § 3730(h).

52.     Following **RUSS**' objection to Defendant's misappropriation of federal funds, Defendant has discriminated, suspended, demoted, threatened, disciplined, harassed and retaliated against **RUSS** for lawful conduct protected under the FCA.

53.     Defendant has terminated, discharged, suspended, threatened, disciplined, harassed, and discriminated against **RUSS** in her employment in violation of 31 U.S.C. § 3730(h).

54.     Defendant has discriminated and retaliated against **RUSS** for lawful and protected conduct in connection with her investigation for, initiation of, testimony, potential testimony concerning, and assistance in an action filed or to be filed under the FCA, 31 U.S.C. § 3729 et seq.

55.     **RUSS** is entitled to all relief necessary to make her whole, including reinstatement with the same seniority status that she would have had but for the discrimination and two times the amount of back pay.

56.    **RUSS**, pursuant to 31 U.S.C. § 3730(h), is entitled to litigation costs and all reasonable attorneys' fees incurred in connection with this action.

57.    **RUSS**' conduct, including but not limited to investigating Defendant's misappropriation of federal funds, and also raising complaints concerning same and bearing witness to violations of same, potential testimony concerning, potential initiation of and assistance in an action filed or potentially to be filed pertaining to the FCA, is all protected conduct under the FCA.

58.    Defendant knew that **RUSS** was engaged in protected conduct as referenced herein.

59.    Defendant discharged, terminated, demoted, suspended, threatened, disciplined and harassed **RUSS** from her employment and after her employment, and otherwise discriminated against her because of her protected conduct.

60.    As a direct and proximate result of the violations of 31 U.S.C. § 3730(h) as referenced and cited herein, **RUSS** has lost all of the benefits and privileges of her employments and has been substantially and significantly injured in her career path that was anticipated from her employment.

61.    As a direct and proximate result of the violations of 31 U.S.C. § 3730(h) as referenced and cited herein, and as a direct and proximate result of the prohibited acts perpetrated against her, **RUSS** is entitled to all relief necessary to make her whole.

**WHEREFORE**, Plaintiff requests trial by jury of all issues so triable as of right, and:

i.     Injunctive relief directing this Defendant to cease and desist from all retaliation against employees who engage in speech protected by the FCA;

ii.    Back pay and all other benefits, perquisites and other compensation for employment which Plaintiff would have received had she maintained her position

with the Defendant, plus interest, including but not limited to lost salary and bonuses;

iii.   Double back pay;

iv.   Front pay, including raises, benefits, insurance costs, benefits costs, and retirement benefits;

v.   Reimbursement of all expenses and financial losses Plaintiff has incurred as a result of the Defendant's actions;

vi.   Declaratory relief declaring the acts and practices of the Defendant to be in violation of the statutes cited above;

vii.   Reasonable attorney's fees plus costs;

viii.   Compensatory damages, and;

ix.   Such other relief as this Court shall deem appropriate.

## COUNT II – VIOLATION OF VIOLATION OF 31 U.S.C. § 3730(h): RETALIATION-JOHNSON

62.   Plaintiff incorporates by reference Paragraphs 1-41 of this Complaint as though fully set forth below.

63.   **JOHNSON**, an employee, believed in good faith, and a reasonable employee in the same or similar circumstances would also believe, that Defendant was committing a fraud upon federal government agencies and other private entities.

64.   Defendant was aware of **JOHNSON**'s disclosure of its alleged misdeeds to her supervisor and administrators.

65.   Immediately thereafter, **JOHNSON** began to receive unsatisfactory performance reviews, reprimands, a hostile work environment, and adverse employment action.

66.     Immediately after objecting to Defendant's misdeeds, **JOHNSON** began to be subjected to retaliation.

67.     Pursuant to 31 U.S.C. § 3730(h) of the False Claims Act (hereinafter "FCA"), any employee who is discharged, demoted, suspended, threatened, harassed and otherwise discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done under the FCA is entitled to all relief necessary to make the employee whole.

68.     The purpose of the FCA, as explained in the Senate report accompanying the 1986 amendments to the FCA, states that Congress added a retaliation provision to the FCA "to halt companies… from using the threat of economic retaliation to silence 'whistleblowers'" and to "assure those who may be considering exposing fraud that they are legally protected from retaliatory acts." S. Rep. No. 99-345, at 34 (1986), U.S. Code Cong. & Admin News 1986, at 5266, 5299.

69.     Defendant began its negative employment actions against **JOHNSON** and ultimately did discharge her from her position for reasons contrary to public policy, as set out in 31 U.S.C. § 3730(h) and without just cause.

70.     Defendant, in discharging, suspending, demoting, threatening, disciplining and harassing **JOHNSON** in and from her employment, retaliated and discriminated against her because of complaints and concerns raised by her to Defendant.

71.     The acts of Defendant in demoting, suspending, threatening, disciplining, harassing, discriminating, and retaliating against **JOHNSON**, including but not limited to the wrongful discharge of employment, adverse employment actions, denial of true and correct performance appraisals, demotion and termination of **JOHNSON** by Defendant violated the provisions of 31 U.S.C. § 3730(h).

72.     Following **JOHNSON**'s objection to Defendant's misappropriation of federal funds, Defendant has discriminated, suspended, demoted, threatened, disciplined, harassed and retaliated against **JOHNSON** for lawful conduct protected under the FCA.

73.     Defendant has terminated, discharged, suspended, threatened, disciplined, harassed, and discriminated against **JOHNSON** in her employment in violation of 31 U.S.C. § 3730(h).

74.     Defendant has discriminated and retaliated against **JOHNSON** for lawful and protected conduct in connection with her investigation for, initiation of, testimony, potential testimony concerning, and assistance in an action filed or to be filed under the FCA, 31 U.S.C. § 3729 et seq.

75.     **JOHNSON** is entitled to all relief necessary to make her whole, including reinstatement with the same seniority status that she would have had but for the discrimination and two times the amount of back pay.

76.     **JOHNSON**, pursuant to 31 U.S.C. § 3730(h), is entitled to litigation costs and all reasonable attorneys' fees incurred in connection with this action.

77.     **JOHNSON**'s conduct, including but not limited to investigating Defendant's misappropriation of federal funds, and also raising complaints concerning same and bearing witness to violations of same, potential testimony concerning, potential initiation of and assistance in an action filed or potentially to be filed pertaining to the FCA, is all protected conduct under the FCA.

78.     Defendant knew that **JOHNSON** was engaged in protected conduct as referenced herein.

79.     Defendant discharged, terminated, demoted, suspended, threatened, disciplined and harassed **JOHNSON** from her employment and after her employment, and otherwise discriminated against her because of her protected conduct.

80.     As a direct and proximate result of the violations of 31 U.S.C. § 3730(h) as referenced and cited herein, **JOHNSON** has lost all of the benefits and privileges of her employments and has been substantially and significantly injured in her career path that was anticipated from her employment.

81.     As a direct and proximate result of the violations of 31 U.S.C. § 3730(h) as referenced and cited herein, and as a direct and proximate result of the prohibited acts perpetrated against her, **JOHNSON** is entitled to all relief necessary to make her whole.

**WHEREFORE**, Plaintiff requests trial by jury of all issues so triable as of right, and:

i.     Injunctive relief directing this Defendant to cease and desist from all retaliation against employees who engage in speech protected by the FCA;

ii.    Back pay and all other benefits, perquisites and other compensation for employment which Plaintiff would have received had she maintained her position with the Defendant, plus interest, including but not limited to lost salary and bonuses;

iii.   Double back pay;

iv.    Front pay, including raises, benefits, insurance costs, benefits costs, and retirement benefits;

v.     Reimbursement of all expenses and financial losses Plaintiff has incurred as a result of the Defendant's actions;

16

vi.       Declaratory relief declaring the acts and practices of the Defendant to be in violation of the statutes cited above;

vii.      Reasonable attorney's fees plus costs;

viii.     Compensatory damages, and;

ix.       Such other relief as this Court shall deem appropriate.

## COUNT III – VIOLATION OF FLORIDA'S PUBLIC WHISTLEBLOWER ACT (PWA)-RUSS

82.      Plaintiff incorporates by reference Paragraphs 1-41 of this Complaint as though fully set forth below.

83.      At all material times, **RUSS** was an employee and the Defendant was her employer covered by and within the meaning of the PWA.

84.      **RUSS** was qualified for the position that she held with the Defendant.

85.      **RUSS** did engage in statutorily protected activity.

86.      **RUSS** did make several disclosures of the Defendant's violations of federal and Florida law and of gross waste and mismanagement to the Defendant.

87.      **RUSS** did suffer adverse employment action, which is causally linked to her engagement in statutorily protected activity.

88.      **RUSS**' complaints and disclosures constitute a protected activity because her complaints and disclosures were concerning an unlawful activity of the Defendant.

89.      Said protected activity was the proximate cause of the Defendant's negative employment actions against **RUSS**, which included Plaintiff's termination.

90.      Instead of investigating **RUSS**' complaints and lauding her honest reporting of violations of law, the Defendant retaliated against **RUSS** by terminating her employment.

17

91.     The acts, failures to act, practices and policies of the Defendant set forth above constitute retaliation in violation of the PWA.

92.     As a direct and proximate result of the violations of the PWA, as referenced and cited herein, **RUSS** has lost all of the benefits and privileges of her employment and has been substantially and significantly injured in her career path.

93.     As a direct and proximate result of the violations of the PWA, as referenced and cited herein, and as a direct and proximate result of the prohibited acts perpetrated against her, **RUSS** is entitled to all relief necessary to make her whole as provided for under the PWA.

94.     As a direct and proximate result of the Defendant's actions, **RUSS** has suffered damages, including but not limited to, a loss of employment opportunities, loss of past and future employment income and fringe benefits, humiliation, and non-economic damages for physical injuries, mental and emotional distress.

**WHEREFORE**, Plaintiff requests trial by jury of all issues so triable as of right, and:

i.      Injunctive relief directing the Defendant to cease and desist from all retaliation against employees who engage in statutorily protected acts;

ii.     Back pay and all other benefits, perquisites and other compensation for employment which Plaintiff would have received had she maintained her position with the Defendant, plus interest, including but not limited to lost salary and bonuses;

iii.    Front pay, including raises, benefits, insurance costs, benefits costs, and retirement benefits;

iv.     Reimbursement of all expenses and financial losses Plaintiff has incurred as a result of Defendant's actions;

18

v.     Declaratory relief declaring the acts and practices of the Defendant to be in violation of the statute cited above;

vi.    Temporary reinstatement under F.S. §112.3187(9)(f);

vii.   Reasonable attorney's fees plus costs;

viii.  Compensatory damages, and;

ix.    Such other relief as this Court shall deem appropriate.

## COUNT IV – VIOLATION OF FLORIDA'S PUBLIC WHISTLEBLOWER ACT (PWA)- JOHNSON

95.    Plaintiff incorporates by reference Paragraphs 1-41 of this Complaint as though fully set forth below.

96.    At all material times, **JOHNSON** was an employee and the Defendant was her employer covered by and within the meaning of the PWA.

97.    **JOHNSON** was qualified for the position that she held with the Defendant.

98.    **JOHNSON** did engage in statutorily protected activity.

99.    **JOHNSON** did make several disclosures of the Defendant's violations of federal and Florida law and of gross waste and mismanagement to the Defendant.

100.   **JOHNSON** did suffer adverse employment action, which is causally linked to her engagement in statutorily protected activity.

101.   **JOHNSON**'s complaints and disclosures constitute a protected activity because her complaints and disclosures were concerning an unlawful activity of the Defendant.

102.   Said protected activity was the proximate cause of the Defendant's negative employment actions against **JOHNSON**, which included Plaintiff's termination.

103.   Instead of investigating **JOHNSON**'s complaints and lauding her honest reporting of violations of law, the Defendant retaliated against **JOHNSON** by terminating her employment.

19

104.    The acts, failures to act, practices and policies of the Defendant set forth above constitute retaliation in violation of the PWA.

105.    As a direct and proximate result of the violations of the PWA, as referenced and cited herein, **JOHNSON** has lost all of the benefits and privileges of her employment and has been substantially and significantly injured in her career path.

106.    As a direct and proximate result of the violations of the PWA, as referenced and cited herein, and as a direct and proximate result of the prohibited acts perpetrated against her, **JOHNSON** is entitled to all relief necessary to make her whole as provided for under the PWA.

107.    As a direct and proximate result of the Defendant's actions, **JOHNSON** has suffered damages, including but not limited to, a loss of employment opportunities, loss of past and future employment income and fringe benefits, humiliation, and non-economic damages for physical injuries, mental and emotional distress.

**WHEREFORE**, Plaintiff requests trial by jury of all issues so triable as of right, and:

i.     Injunctive relief directing the Defendant to cease and desist from all retaliation against employees who engage in statutorily protected acts;

ii.    Back pay and all other benefits, perquisites and other compensation for employment which Plaintiff would have received had she maintained her position with the Defendant, plus interest, including but not limited to lost salary and bonuses;

iii.   Front pay, including raises, benefits, insurance costs, benefits costs, and retirement benefits;

iv.    Reimbursement of all expenses and financial losses Plaintiff has incurred as a result of Defendant's actions;

v.       Declaratory relief declaring the acts and practices of the Defendant to be in violation of the statute cited above;

vi.      Temporary reinstatement under F.S. §112.3187(9)(f);

vii.     Reasonable attorney's fees plus costs;

viii.    Compensatory damages, and;

ix.      Such other relief as this Court shall deem appropriate.


Respectfully submitted,


Dated: July 6, 2020          **/s/ Benjamin H. Yormak**
Benjamin H. Yormak
Florida Bar Number 71272
Trial Counsel for Plaintiffs
YORMAK EMPLOYMENT & DISABILITY LAW
9990 Coconut Road
Bonita Springs, Florida 34135
Telephone: (239) 985-9691
Fax: (239) 288-2534
Email: byormak@yormaklaw.com