UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CHERI RUSS and JUDITH
JOHNSON, an individual,

       Plaintiffs,

v.                             Case No.:  2:20-cv-484-FtM-66MRM

THE SCHOOL BOARD OF LEE
COUNTY, FLORIDA,

       Defendant.

_____/

## REPORT AND RECOMMENDATION

Pending before the Court is Plaintiffs' Motion for Temporary Reinstatement Under F.S. § 112.3187(9)(f), filed on July 9, 2020.  (Doc. 7).  Defendant, the School Board of Lee County, Florida, filed Defendant's Response to Plaintiffs' Motion for Reinstatement on September 4, 2020.  (Doc. 18).  With leave of the Court, Plaintiffs filed their reply on September 16, 2020 (Doc. 26), and Defendant filed its sur-reply on December 14, 2020 (Doc. 33).  The Undersigned held an evidentiary hearing on the matter on January 22, 2020.  (Doc. 48).[1]  This matter is ripe for review.  For the reasons set forth below, the Undersigned recommends that Plaintiffs' Motion for Temporary Reinstatement Under F.S. § 112.3187(9)(f) (Doc. 7) be **GRANTED**.

---

[1] Although an evidentiary hearing is not required by the relevant statute, the Undersigned deemed the hearing prudent given the parties' disagreement as to the sufficiency of the written record and the need to submit this matter to the presiding United States District Judge on a complete and thorough record.

## BACKGROUND

Plaintiffs Cheri Russ and Judith Johnson, former employees of Defendant, filed their Complaint (Doc. 1) on July 6, 2020, alleging that Defendant violated 31 U.S.C. § 3730(h) and Florida's Whistle-blower Act ("FWA") by terminating their employment in retaliation for engaging in statutorily protected activity.  (*See generally* Doc. 1).  In the motion *sub judice*, Plaintiffs seek temporary reinstatement under Fla. Stat. § 112.3187(9)(f), pending final resolution of the action on its merits.  (*See* Doc. 7).

Plaintiffs allege that they were asked to participate in an audit and investigate certain financial discrepancies at the Fort Myers Technical College ("FMTC") and the Public Service Academy ("PSA").  (*See* Doc. 50 at 11-12, 74).

Russ testified that in November of 2018, the FMTC bursar called Russ while trying to reconcile the Pell account, informing her that the account was overdrawn by $10,000.  (Doc. 50 at 11; *see also* Doc. 26-1 at 1).  Russ explained that because this is a trust account, "a $10,000 loss was huge." (Doc. 50 at 11).  She testified that she informed Bob Brown, Director of Internal Auditing, of the issue, and Brown asked Russ to investigate the issue further and that Greg Blurton, the Chief Financial Officer, eventually asked Russ to continue the investigation.  (*Id.*).  Russ testified that because she was unfamiliar with the Pell grant process, she asked Johnson to assist her, (*id.*), and Johnson testified that she was later formally asked to join the investigation by Blurton and Brown, (*id.* at 74).

Russ testified that as the investigation continued, Johnson and Russ found that the issue "compounded." (*Id.* at 16-17). Specifically, they discovered that unbalanced spreadsheets were approved, student ledgers were incorrect, students had not been billed for their programs, CareerSource owed the District over $120,000 and no one was trying to collect, Pell grant money was owed to students, and VA money was not applied in a timely manner. (*Id.*). Plaintiffs allege that in attempting to identify and remedy the issues, they both made any number of protected disclosures that warrant temporary reinstatement. (*See* Doc. 26 at 2-7; *see also* Doc. 26-1 at 2-7).

Defendant denies that Plaintiffs made a single disclosure protected by the FWA. (Doc. 33 at 2).

## LEGAL STANDARDS

Florida's Whistle-blower's Act prohibits employers "from taking retaliatory action against an employee who reports to an appropriate agency violations of law on the part of a public employer or independent contractor that create a substantial and specific danger to the public's health, safety, or welfare." Fla. Stat. § 112.3187(2). The statute also provides for an employee's temporary reinstatement if certain conditions are met:

> Temporary reinstatement to the employee's former position or to an equivalent position, pending the final outcome on the complaint, if an employee complains of being discharged in retaliation for a protected disclosure and if a court of competent jurisdiction or the Florida Commission on Human Relations, as applicable under s. 112.31895, determines that the disclosure was not made in bad faith or for a wrongful purpose or occurred after an agency's initiation of a personnel action against the employee which

> includes documentation of the employee's violation of a disciplinary standard or performance deficiency.   This paragraph does not apply to an employee of a municipality.

Fla. Stat. § 112.3187(9)(f).[2]

Temporary reinstatement is required under the statute if Plaintiffs can demonstrate that "1) prior to termination the employee made a disclosure protected by the statute; 2) the employee was discharged; and 3) the disclosure was not made in bad faith or for a wrongful purpose, and did not occur after an agency's personnel action against the employee." *Vickaryous v. Sch. Bd. of Collier Cty.*, No. 2:18-CV-315-FTM-99MRM, 2019 WL 949303, at *1 (M.D. Fla. Feb. 27, 2019) (quoting *State, Dep't of Transp. v. Fla. Comm'n on Human Relations*, 842 So. 2d 253, 255 (Fla. 1st DCA 2003)).[3]

---

[2] The parties stipulate that a school board is not a municipality under the statute, (*see* Doc. 41), and this Court has recently reached the same conclusion, *see Vickaryous v. Sch. Bd. of Collier Cty.*, No. 2:18-CV-315-FTM-99MRM, 2019 WL 949303, at *1 n.1 (M.D. Fla. Feb. 27, 2019) (Steele, J.).  Accordingly, the express exception under Fla. Stat. § 112.3187(9)(f) for employees of a municipality does not apply.

[3] Although the plain language of the statute requires that for an employee to be entitled to temporary reinstatement, the employee must "complain[] of being discharged in retaliation for a protected disclosure," Fla. Stat. § 112.3187(9)(f), the parties here have not addressed the issue of causation and at least one jurist of this Court has found that causation need not be addressed in connection with temporary reinstatement.  *See Vickaryous v. Sch. Bd. of Collier Cty.*, No. 2:18-CV-315-FTM-99MRM, 2019 WL 949303, at *4 (M.D. Fla. Feb. 27, 2019) (Steele, J.) (finding that because "at this stage [the Court] need not determine whether plaintiff can make a prima facie case of retaliation under the FWA, nor whether defendant will succeed on its affirmative defenses," the Court need not resolve the disputed issue of whether the plaintiff's discharge was a result of the protected activity).

Defendants do not dispute that Plaintiffs meet the second and third requirements.  (*See* Docs. 18; 33).  Thus, the only issue before the Court at this time is whether Plaintiffs can demonstrate for purposes of obtaining temporary reinstatement[4] that they made a disclosure protected by the statute.  *See id.*  The Court need only find one protected disclosure to order temporary reinstatement.  *See* Fla. Stat. § 112.3187(9)(f).

To establish that a disclosure is protected under the Florida Whistle-blower's Act, a plaintiff must show that she disclosed (1) protected information, (2) to a protected person, and (3) in a protected manner.  *See* Fla. Stat. § 112.3187(4)-(7); *see also Smith v. City of Tallahassee*, No. 4:17CV565-RH/CAS, 2018 WL 6714325, at *3 (N.D. Fla. Dec. 13, 2018), *aff'd*, 789 F. App'x 783 (11th Cir. 2019) ("[A] plaintiff must meet the separate requirements set out in the statute's subsections (4), (5), (6), and (7).").

Under the first prong, a disclosure of protected information must concern:

> (a) Any violation or suspected violation of any federal, state, or local law, rule, or regulation committed by an employee or agent of an agency or independent contractor which creates and presents a substantial and specific danger to the public's health, safety, or welfare.
>
> (b) Any act or suspected act of gross mismanagement, malfeasance, misfeasance, gross waste of public funds, suspected or actual Medicaid fraud or abuse, or gross

---

[4]  The only issue before the Court at this time is the preliminary question of whether Plaintiffs have made an initial showing under the statute that they are entitled to temporary reinstatement.  *See Vickaryous*, 2019 WL 949303, at *3 n.3.  The Court need not determine at this stage whether Plaintiffs have actually proven their FWA claims.  *Id.*

neglect of duty committed by an employee or agent of an
agency or independent contractor.

Fla. Stat. § 112.3187(5)(a)-(b).

The FWA defines "[g]ross mismanagement" as "a continuous pattern of
managerial abuses, wrongful or arbitrary and capricious actions, or fraudulent or
criminal conduct which may have a substantial adverse economic impact."  Fla. Stat.
§ 112.3187(3).  It does not, however, define misfeasance or malfeasance.  *See id.*  The
Florida Supreme Court has nonetheless defined "[m]isfeasance . . . as the 'improper
doing of an act which a person might lawfully do; and "malfeasance" [as] the doing
of an act which a person ought not do at all.'"  *Irven v. Dep't of Health & Rehab. Servs.*,
790 So. 2d 403, 407 n.3 (Fla. 2001) (quoting *Black's Law Dictionary* 1000 (6th ed.
1990)).  Florida courts have liberally construed misfeasance to include negligent acts.
*See Rosa v. Dep't of Children & Families*, 915 So. 2d 210, 212 (Fla. 1st DCA 2005); *see
also Batz v. City of Sebring*, No. 17-14107-CIV, 2019 WL 11637131, at *17 (S.D. Fla.
Mar. 21, 2019), *aff'd*, 794 F. App'x 889 (11th Cir. 2019) (citing *Rosa*, 915 So. 2d at
212, and finding misfeasance includes negligent acts).

Under the second prong—*i.e.*, disclosure to a protected person—disclosures
concerning school districts must be disclosed to "to a chief executive officer as
defined in s. 447.203(9) or other appropriate local official."  Fla. Stat. § 112.3187(6).
Under Fla. Stat. § 447.203(9), the chief executive officer is defined as "the Governor
and for other public employers shall mean the person, whether elected or appointed,
who is responsible to the legislative body of the public employer for the

administration of the governmental affairs of the public employer."  For a school district, this is the superintendent, unless otherwise provided by law.  Fla. Stat. § 1001.33.

Alternatively, Florida courts have defined an "appropriate local official" as "an official or official entity who is affiliated with the violating governmental entity and [who] has the authority to investigate, police, manage, or otherwise remedy the violation or act by the violating governmental entity."  *Rustowicz v. N. Broward Hosp. Dist.*, 174 So. 3d 414, 424 (Fla. 4th DCA 2015).  Thus, "the protection extends to disclosures to members of boards, committees, departments, or divisions affiliated with the offending governmental entity, so long as the board, committee, department, or division has the authority to investigate, police, manage, or otherwise remedy the violation or act by the violating governmental entity."  *Id.*

Under the third and final prong—*i.e.*, disclosure in a protected manner—the statute, *inter alia*, "protects employees and persons who disclose information on their own initiative in a written and signed complaint [or] who are requested to participate in an investigation, hearing, or other inquiry conducted by any agency or federal government entity."  Fla. Stat. § 112.3187(7).

The Undersigned next analyzes the parties' arguments as to each prong in turn.

## ANALYSIS

### I.   Whether Plaintiffs' Disclosures Were Protected Information.

First, Plaintiffs must demonstrate that the information they disclosed included the matters specified in the statute, as construed by case law.  *See* Fla. Stat. § 112.3187(5).  In that regard, Plaintiffs rely on an extensive series of disclosures they contend included protected information under the statute.  (*See* Doc. 26-1).

For its part, Defendant argues that Plaintiffs have not met their burden to prove they made even one protected disclosure.  Specifically, Defendant argues that even given Russ's declaration and supporting documents attached to Plaintiffs' reply, the allegations are "vague, confusing, or conclusory" and lack evidentiary support. (Doc. 33 at 2 (citing *Broward County Sherriff's Office v. Hamby*, 300 So. 3d 213, 216-17 (Fla. 4th DCA 2020))).  Defendant then addresses several of the alleged disclosures to illustrate their insufficiency.  (*Id.* at 2-4).

At the evidentiary hearing, Defendant argued that Plaintiffs' alleged disclosures lacked requisite specificity because (1) Plaintiffs never claimed or alleged in their communications any specific violation of a particular law and (2) Plaintiffs did not explicitly name a specific employee whom they believed violated any law. Because these latter arguments apply globally to all of Plaintiffs' alleged disclosures, the Undersigned addresses them next and then addresses the sufficiency of each Plaintiffs' alleged disclosures in turn.

A.    Specificity

The Undersigned finds Defendant's arguments concerning specificity unpersuasive.  To begin, the statute does not require Plaintiffs to use specific words when making a protected disclosure.  Fla. Stat. § 112.3187(5)-(7).  In *Burden v. City of Opa Locka*, a federal trial court held on summary judgment that simply providing a repair invoice and a rental-car invoice in response to an investigation of a car accident was enough to establish a *prima facie* case for protected activity because "a reasonable jury could draw the inference that these invoices represented misfeasance or malfeasance."  No. 11-22018-CIV, 2012 WL 4764592, at *14 (S.D. Fla. Oct. 7, 2012).  Similarly, the court found that the plaintiff's assertions that "the department was completely disorganized, the department's policies and procedures were outdated, and discipline was delivered in an inconsistent manner" and describing his supervisor as " a poor administrator" were enough to establish a *prima facie* case for protected activity.  *Id.*

Additionally, courts construe the FWA liberally.  *See Irven v. Dep't of Health and Rehab. Servs.*, 790 So. 2d 403, 405 (Fla. 2001).  To require formal legalistic language conflicts with a liberal construction of the statute.  *See King v. State of Fla.*, 650 F. Supp. 2d 1157, 1163 (N.D. Fla. 2009) (citing *Irven*, 790 So. 2d at 405, and noting that "a potential complainant is not required to use formal legalistic language in order to lodge a complaint that invokes whistle-blower protection").

Moreover, the cases on which Defendant bases its specificity argument are distinguishable because those cases involved alleged disclosures that were more conclusory or lacking in factual detail or context than most of the disclosures alleged in the instant case. *See, e.g.*, *Broward County Sherriff's Office v. Hamby*, 300 So. 3d 213, 216-17 (Fla. 4th DCA 2020) (finding that a plaintiff who made conclusory allegations that her supervisor subjected her to a hostile work environment and took adverse actions based on her inclusion in a protected class, without providing any factual support as to how the environment was hostile or what adverse actions were taken, was not entitled to temporary reinstatement because the Court could not discern whether the plaintiff made a protected disclosure); *Nazzal v. Fla. Dep't of Corrections*, 267 So. 3d 1094, 1097 (Fla. 1st DCA 2019) (concluding that the plaintiff failed to establish that she made a protected disclosure in either expressing displeasure with a supervisor's management style or making a conclusory allegation that she was subjected to "disparate treatment which is in direct violation of the 1964 [C]ivil [R]ights [A]ct" without providing any factual details as how she was treated disparately, how the treatment was based on a protected characteristic, or who treated her in that way), *review denied*, No. SC19-793, 2019 WL 6248307 (Fla. Nov. 22, 2019); *Caldwell v. Fla. Dep't of Elder Affairs*, 121 So. 3d 1062, 1063 (Fla. 1st DCA 2013) (finding that the plaintiff's conclusory allegation that she alerted a federal investigator of "the condition of the FDEA's Ombudsman program and the gross misfeasance and malfeasance occurring within" was insufficient to establish a *prima facie* case for protected activity because the plaintiff failed to describe the act or

suspected act of misfeasance or malfeasance); *Stanton v. Fla. Dep't of Health*, 129 So. 3d 1083, 1084 (Fla. 1st DCA 2013) (affirming the Florida Commission on Human Relations' dismissal of the plaintiff's complaint because the plaintiff failed to provide any factual basis to support his allegation that his termination was motivated by his disclosures); *Smith v. City of Tallahassee*, No. 4:17CV565-RH/CAS, 2018 WL 6714325, at *5 (N.D. Fla. Dec. 13, 2018), *aff'd*, 789 F. App'x 783 (11th Cir. 2019) (finding that the plaintiff's opinion it was possible that a connection between static electric shocks and the city's transmission lines existed did not rise to the level of accusing a city employee or independent contractor of any wrongdoing). The Undersigned finds that the disclosures here, as examined in more detail below, contained greater factual information and context than the disclosures at issue in the cases Defendant cites.

Likewise, the Undersigned is not persuaded that Plaintiffs were required to name a specific employee or wrongdoer in their disclosures. Again, the statute does not require it. *See* Fla. Stat. § 112.3187(5)-(7). And although the court in *Burden*, 2012 WL 4764592, at *18, rejected one of the alleged protected disclosures because the plaintiff did not "point to any facts from which a reasonable jury could infer that . . . [a] specific individual was responsible" for the managerial problems, the same cannot be said of the Plaintiffs' alleged disclosures here.

Both Plaintiffs testified at the evidentiary hearing that the context of their disclosures would allow a reasonable inference as to who was responsible for the complained-of issue without needing to identify a specific employee either by name

or by position.  For example, as it relates to student accounts, both Russ and Johnson testified that the bursar and bookkeepers are responsible for administering the accounts.  (*See* Doc. 50 at 64-65, 85-86).  Specifically, when asked whether Russ identified employees by position who would have been responsible for the mismanagement or neglect of duty during meetings regarding the audit, she answered affirmatively and stated that because of the lack of training, "[t]he bookkeeper and the bursar at the school" were not handling the student accounts correctly.  (*Id.* at 64-65).  Similarly, when asked if she identified employees by position, Johnson testified that she "repeatedly, throughout clarif[ied] th[e] roles for [Russ] and the rest of the lead team" as to "who is responsible for each of the[] steps in the process of administering student accounts."  (*Id.* at 85-86).  The Undersigned is persuaded that, as Johnson explained, "by identifying all of these areas of noncompliance regarding [FMTC]," (*see id.* at 96), the context of the disclosures was sufficient to identify the person or persons who, by their positions within Defendant, were responsible for the complained-of conduct.

For these reasons, the Undersigned finds that the Court cannot categorically reject all of Plaintiffs' alleged disclosures under the first prong on specificity grounds alone.  The Undersigned next addresses the sufficiency of each Plaintiffs' alleged disclosures.

### B.    Plaintiff Cheri Russ's Disclosures

Plaintiff Cheri Russ argues that she made approximately eight categories of disclosures involving protected information under the statute.

### 1.    Oral and Written Reports to Bob Brown

Russ testified that, beginning on November 3, 2019, she made oral and written reports to Bob Brown in which she disclosed that the Pell account was negative and that she continued to update him weekly, including communicating mismanagement of the federal Pell funds and VA benefits.  (Doc. 50 at 20-21).

In early March, Russ provided Brown with her first written report.  (*Id.* at 21; Doc. 49-6 at 1-6).  Although the exhibit Russ supplied to the Court is an updated version of the report containing subsequent annotations in blue text, Russ testified that everything in report except the blue text was given to Brown in the original March report.  (*See* Doc. 50 at 57).  The report details the specific issues and areas of noncompliance that the investigating team found, including that Pell funds were incorrectly applied and that VA awards, scholarships, CareerSource funding, and other funding sources were not applied to student accounts timely.  (*See* Doc. 49-6 at 1-6).  Russ maintains that she handed the report to Brown in March, even though the document itself does not reflect that it was provided to Brown.  (Doc. 50 at 56).

Additionally, Russ testified that in July 2019, she sent an updated version of her report, which included the subsequent annotations in blue text, to Dr. Desamours, Brown, and Johnson, who at the time was the Interim Senior Director of the Technical Colleges.  (*Id.* at 36).  The updated version of the report is essentially, if not entirely, the same document as the March report and contains the same findings.  (*Compare* Doc. 49-6 *with* Doc. 49-14).  Russ testified that the various

issues identified in the report could have repercussions, such as fines imposed by the state or federal departments of education and an audit.  (Doc. 50 at 37-38).

The Undersigned finds that insofar as Russ's written reports included allegations that federal Pell funds were being incorrectly applied and other awards were not being timely applied, the reports allege, at a minimum, misfeasance in the form of negligence on the part of the individuals tasked with maintaining the subject records and accounts.  *See* Fla. Stat. § 112.3187(5)(b).  Moreover, although Russ may not have identified the specific individuals alleged to be at fault, Russ testified that the bursar is responsible for at least some of the items described in the reports.  (*See* Doc. 50 at 56).  Additionally, Russ testified that she orally identified the bookkeeper and bursar as the responsible parties for the improperly handled student accounts.  (*See id.* at 64).  Accordingly, the Undersigned finds that a person could reasonably determine from the context of the allegations that the bookkeepers and bursar, who are responsible for financial aid and record keeping, are the specific individuals responsible.  *See Burden*, 2012 WL 4764592, at *18.

Thus, the Undersigned finds that these written reports constitute protected disclosures.  To the extent Russ's oral disclosures to Brown mirrored the allegations in the written reports, the Undersigned finds that those oral disclosures were also protected.

### 2.   Email Exchange with Susan Melay

Russ also relies on an April 23-24, 2019 email thread between herself and Susan Melay, Executive Director, Business Services, detailing the internal audit's

findings, including how much money was in each funding source and what had been collected over the years.  (Doc. 50 at 25-26; Doc. 49-7 at 1-3).  Upon review, the Undersigned finds that this email thread does not qualify as a protected disclosure. Specifically, while the document relates to financial information from the audit, it does not allege or even suggest mismanagement, malfeasance, or misfeasance.  (*See* Doc. 49-7 at 2).  Nothing in the email would allow a reader to reasonably interpret it as alleging or suggesting those things.  *See Batz v. City of Sebring*, 794 F. App'x 889, 902 (11th Cir. 2019) (concluding that a simple workplace email with a primary purpose of seeking clarification and otherwise containing no reference to any alleged wrongdoing could not constitute a protected disclosure).  Accordingly, this email does not appear to constitute a protected disclosure.

### 3.    Dr. Desamours's Report

In June 2019, Dr. Desamours compiled a report and submitted it to Dr. Adkins, the Superintendent.  (Doc. 50 at 30; Doc. 49-11 at 1-2).  In the report, Dr. Desamours detailed the nature and extent of the errors the audit team found, including evidence of "over or under billing student tuition, misapplying financial aid to student accounts, incorrectly deferring invoices, having duplicate records for students, and inaccurately accounting for outside disbursements."  (Doc. 49-11 at 1-2).  Notably, Dr. Desamours testified that "most of the information" stemmed from Russ's and Sarah Cox's efforts.  (Doc. 50 at 124).  Similarly, Russ specified that she provided the statistical information in the report, the following paragraph, and much of the other information in the report.  (*Id.* at 31-32; *see also* Doc. 49-11 at 1).

The Undersigned finds no basis on which to conclude that Dr. Desamours's report constitutes a protected disclosure by Russ, even if Russ provided much of the content of the report.  To the extent Russ communicated some of the underlying information to Dr. Desamours in the first instance, however, Russ's disclosures to Dr. Desamours about the ongoing issues regarding the management of funds at FMTC would be protected.  (*see* Doc. 50 at 31-32; 124).  The context of that information would, at a minimum, disclose misfeasance (or suspected misfeasance) in the form of negligence by the employees responsible for managing those funds, namely the bursar and bookkeepers tasked with maintaining student accounts.  *See* Fla. Stat. § 112.3187(5)(b).

### 4.   The PSA Audit Report

Russ testified that she prepared an audit report for the PSA during the investigation.  (Doc. 50 at 32-33; Doc. 49-12 at 1-2).  Although Todd Everly contends that he never received the report in draft form, (*see* Doc. 50 at 138), Russ testified that the draft report was used during the internal audit exit conference with Everly, as Director of the PSA, in late June, (*id.* at 35).  Russ testified that at the exit conference, she and Mr. Everly discussed the findings contained therein, and after the interview, the report was finalized and presented to Dr. Adkins.  (*Id.* at 35).  The report details Russ's findings, including that disbursements were not consistently posted as required to FOCUS – the system used to monitor the hours students are in class – and that financial aid codes were not accurately recorded in student schedule records.  (Doc. 49-12 at 2).  Russ maintains that the report was sent to Brown,

Johnson – who at the time was the Interim Senior Director of the Technical Colleges – and Everly.  (Doc. 50 at 33).[5]

The Undersigned finds that the disclosures made in the report are protected. Although Everly testified at the evidentiary hearing that he never received the document, (*see id.* at 138), Defendant has not otherwise offered evidence to contradict Russ's sworn testimony that the report was given to Brown or Johnson. Moreover, in noting the discrepancies between the student ledgers and funding disbursements, it relates to, at minimum, a suspected act of misfeasance stemming from the negligence of those tasked with inputting the information.  *See* Fla. Stat. § 112.3187(5)(b).  Although it does not name a particular person, the Undersigned finds that the context of the disclosures and the investigation would support an inference as to who was responsible for the issues identified therein, namely the bursar and bookkeepers.  *See Burden*, 2012 WL 4764592, at *18.

### 5.    July 23, 2019 Email to Dr. Desamours

On July 23, 2019, Russ emailed Dr. Desamours to update her on the findings and progress of the audit.  (Doc. 50 at 39; Doc. 49-15).  The email specified that the audit was about half complete and that of the 40% of ledgers discovered to be incorrect, 85% had been corrected.  (Doc. 49-15 at 1).  Nevertheless, the email noted that money was still owed to students and funding sources.  (*Id.*).  Finally, the email

---

[5]  Defendant disputes this allegation and points out that the document is labeled as a draft, has incorrect dates, and contains no evidence of transmission to Everly.  (*See* Doc. 50 at 61).

noted that processes were put in place to ensure reconciliation of student accounts and financial aid transactions going forward.  (*Id.*).

Upon review, the Undersigned finds that this email does not qualify as a protected disclosure.  Specifically, although the email generally relates to the issues discovered in the audit – *i.e.* the misfeasance related to maintaining student accounts – it does not allege or even suggest mismanagement, malfeasance, or misfeasance by an employee.  (*See id.*).  Moreover, nothing in the email allows a reader to reasonably interpret it as alleging or suggesting those things or otherwise incorporating previous protected disclosures.  *See Batz*, 794 F. App'x at 902 (concluding that a simple workplace email with a primary purpose of seeking clarification and otherwise containing no reference to any alleged wrongdoing could not constitute a protected disclosure).

To the extent Plaintiffs may attempt to argue that this disclosure relates to the investigation as a whole and, therefore, incorporates any oral disclosures made throughout the investigation, the Undersigned is unpersuaded.  Rather, without otherwise identifying any act or suspected act of mismanagement, malfeasance, or misfeasance or incorporating a previous protected disclosure, a simple status update on an investigation does not constitute a protected disclosure.  *Burden*, 2012 WL 4764592, at *19 (finding that briefing a superior on the status of an investigation, without otherwise reporting any act or violation or suspected act or violation cannot constitute a protected disclosure).

6.   **Disclosures Relating to the PSA's Fee Disclosures and Sales Tax**

Russ testified that as the investigation continued, the team needed to investigate students at the PSA because their financial aid is handled by FMTC. (Doc. 50 at 40).  In doing so, Russ found that there were discrepancies in the fee disclosures relating to fees being used to pay instructor salaries.  (*Id.*).  Additionally, Russ testified that the team discovered that the PSA was not paying sales tax on items resold to the students in violation of Department of Revenue regulations.  (*Id.* at 41).  As a result, Russ emailed Everly, who at the time was the Director of the PSA, describing the fee disclosure issues, and, in response, Everly thanked Russ for finding the issue and asking her to provide the necessary language to remedy the error.  (Doc. 49-16 at 1).  In a separate email within the thread, Russ copied Everly on an email that disclosed the sales tax issue.  (*Id.* at 4-5).

The Undersigned finds that this email thread does not qualify as a protected disclosure.  Specifically, while the email relates to at least a suspected act of misfeasance as to fee disclosures and, at most, a suspected violation of the law as it relates to the sales tax issue, the Undersigned finds that the context of the disclosures even in light of the investigation as a whole would not allow a reasonable inference as to who was responsible for the complained-of issue.  *See Burden*, 2012 WL 4764592, at *18.  Specifically, because the identified issues involve issues other than disbursing funds and maintaining student accounts, the record does not contain sufficient information to support a reasonable inference as to who was responsible for

the complained-of issue.  Accordingly, these disclosures are not protected and do not support temporary reinstatement.

### 7.    The PSA Disclosures to Dr. Desamours

Russ testified that following a phone conversation with Dr. Desamours in which Dr. Desamours noted tension between Johnson and Everly, Russ sent a follow-up email.  (Doc. 50 at 44).  In her email, Russ reiterates the various issues found during the internal audit, including the discrepancy between attendance hours and the information sent to VA and Pell grant for a financial aid student at PSA, the lack of information on how many hours short-course instructors spent actually instructing, and that sales tax as not paid on items re-sold to students at the PSA. (*Id.* at 49; Doc. 49-17 at 1).

The Undersigned finds that this email thread does not qualify as a protected disclosure.  Specifically, while the document relates to financial information from the audit, it does not allege or even suggest mismanagement, malfeasance, or misfeasance.  (*See* Doc. 49-7 at 2).  Nothing in the email allows a reader to reasonably interpret it as alleging or suggesting those things or otherwise incorporating previous protected disclosures.  *See Batz v. City of Sebring*, 794 F. App'x 889, 902 (11th Cir. 2019) (concluding that a simple workplace email with a primary purpose of seeking clarification and otherwise containing no reference to any alleged wrongdoing could not constitute a protected disclosure).  Moreover, because it seems the primary purpose was not to disclose any suspected misfeasance but rather to give context to potential tension between Everly and Johnson, (*see* Doc. 49-7 at 2), it does

not constitute a protected disclosure, *see Batz*, 794 at 902 (supporting the conclusion that an email is not a protected disclosure in part by noting that the primary purpose of the email was clarification).

### 8. PowerPoint Presentation Notes

In late October, Russ was sent to a conference to continue her education relating to Pell grants. (Doc. 50 at 50). Russ testified that, during a workshop, she took notes on a PowerPoint presentation on items that she believed still needed to be reviewed for compliance in the event of a state or federal audit. (*Id.* at 50-51; Doc. 49-20). Russ testified that she provided the notes to Everly at a meeting following the presentation but that the two had no further substantive discussion. (*Id.*).

The Undersigned finds that Russ has not met her burden to show that the notes written on the side of the PowerPoint are protected disclosures. Although Russ testified that she took notes on items that she believed still needed to be reviewed for compliance, (Doc. 50 at 50-51), neither the notes nor any further specifying information was provided such that the Court can determine whether the disclosed acts or suspected acts of mismanagement, malfeasance, or misfeasance. *See Broward County Sheriff's Office v. Hamby*, 300 So. 3d 213, 216-17 (Fla. 4th DCA 2020) (finding that merely alleging a violation without providing sufficient facts does not constitute a protected disclosure).

C.      **Plaintiff Judy Johnson's Disclosures**

Plaintiff Judy Johnson argues that she made approximately five categories of disclosures involving protected information under the statute.

1.      **February 27, 2019 Email and Oral Disclosures**

Russ testified that in February of 2019, she and Johnson participated in a meeting with Brian Mangan – Senior Director of the Technical Colleges – to formulate a plan to review and correct every student ledger.  (*See* Doc. 50 at 17-18). On February 27, 2019, Johnson emailed Mangan to describe the steps needed to remedy the noncompliant practices in maintaining the student accounts.  (*See* Doc. 50 at 18, 75-76; Doc. 49-5 at 1-2).  Johnson testified that she later discussed the email with Mangan and that she specifically noted the importance of getting the work done in a timely manner and likely outcomes if the items were not addressed before a state or federal audit.  (Doc. 50 at 76).  Johnson testified Mangan agreed to have a team focus on reconciling the student accounts over Christmas break.  (*Id.*).

Johnson also testified that during the process of reviewing and correcting each student ledger, the team considered each student account and compared it to federal financial aid procedures to determine what needed to be done to correct the account. (*Id.* at 75).  Russ testified that as the team began to go through each student account, Johnson assisted in determining whether each account was incorrect.  (*Id.* at 19-20). Russ testified that Johnson ultimately reported mismanagement of the federal Pell funds to the audit team and noted that the student accounts were incorrect because

22

Pell grant disbursements were owed to students from the prior semester.  (*Id.* at 19).

Similarly, Russ testified that when Johnson saw the VA account, she explained that

the money cannot remain there and that it must be disbursed.  (*Id.* at 19-20).  Finally,

Russ testified that when she showed Johnson student ledgers, Johnson verified that

the ledgers were incorrect.  (*Id.* at 20).  Johnson similarly testified that she reported

these issues to Russ and explained the rules for administrating financial aid and the

order in which the aid needs to be administered.  (*Id.* at 76-77).

The Undersigned finds that Johnson's alleged oral disclosures to Russ in the

context of the investigation are protected.  Russ and Johnson described in their

testimony the specific findings and disclosures allegedly made by Johnson.  (*See id.* at

19-20, 76-77).  Additionally, the record is clear that Johnson was asked to participate

in the investigation because of her knowledge and expertise in federal financial aid.

(*See id.* at 12, 72-73, 74, 76, 78).  In this context, for Johnson to determine the steps

necessary to remedy the identified issues, (*see* Doc. 49-5 at 2), her disclosures to Russ

must have been as described by Plaintiffs—*i.e.*, that the accounts were inaccurate and

the cause for the inaccuracies was issues with the distribution of funds such as Pell

grants, (*see* Doc. 50 at 19-20, 76-77).  Moreover, although it is unclear from her

testimony whether Johnson identified a specific individual at this time, Johnson

testified that she repeatedly clarified who was responsible for which step of

administering student accounts.  (*Id.* at 85-86).  Thus, in disclosing that the accounts

were inaccurate because Pell funds were still owed to students, Johnson, at a

minimum, disclosed to Russ misfeasance or suspected misfeasance in the form of

negligence by the employees responsible for managing those funds and student accounts. *See* Fla. Stat. § 112.3187(5)(b).

As for the February 2019 meeting about how to remedy student ledgers, although Russ testified that Johnson participated in the meeting, (Doc. 50 at 17-18), and Johnson testified that she noted the importance of remedying the situation, (*id.* at 76), there is insufficient record evidence to demonstrate that *Johnson* disclosed any information relating to the suspected misfeasance in managing the funds and student accounts *to Mangan* in the meeting.

Moreover, the February 27, 2019 email from Johnson to Mangan and Johnson's subsequent discussions also do not appear to rise to the level of protected disclosures. The email on its face only identifies how to correct FMTC's noncompliant practices. (*See* Doc. 49-5 at 1-2). It does not specifically list or allege such practices in the first instance. (*Id.*). Nothing in the email allows a reader to reasonably interpret it as alleging or suggesting those things or otherwise incorporates previous protected disclosures by Johnson. *See Batz v. City of Sebring*, 794 F. App'x 889, 902 (11th Cir. 2019) (concluding that a simple workplace email with a primary purpose of seeking clarification and otherwise containing no reference to any alleged wrongdoing could not constitute a protected disclosure). Johnson's alleged discussions with Mangan after the email are similarly deficient because merely noting to Mangan the importance of getting the work done in a timely manner and the consequences for any further state or federal audit does not itself constitute an allegation or suggestion of mismanagement, malfeasance, or

misfeasance, or otherwise incorporate previously protected disclosures by Johnson. Accordingly, the email and Johnson's subsequent discussions Mangan do not constitute protected disclosures. *See Batz*, 794 F. App'x at 902.

### 2.   Johnson's Role in Russ's Internal Reports

As laid out fully above, Russ authored an internal report in March, which was updated in July. *See* Part I.B.1. *supra*. Johnson testified that she contributed to the findings included in the report. (Doc. 50 at 77-81, 86-87). Specifically, Johnson testified that she contributed to the findings that: (1) Pell and VA awards were not correctly and timely applied to student accounts; (2) the student ledgers were not reliable; (3) scholarships and CareerSource were not applied to student accounts; (4) 1098-T forms were missing; (5) $120,000 needed to be collected from CareerSource; (6) certain scholarships needed to note whether they are based on financial need; and (7) the cost of attendance needed to be reviewed regularly as required by federal law. (*Id.* at 78-81, 86-87; Doc. 49-6 at 1-6; Doc. 49-14 at 1-6).

The Undersigned finds no basis for concluding that Russ's report itself should be imputed to Johnson as a protected disclosure by Johnson, even if she was responsible for providing much of the content of the report. To the extent Johnson communicated some of the underlying information to Russ in the first instance, however, Johnson's oral disclosures to Russ explaining the ongoing issues regarding the management of funds, student accounts, and cost of attendance would be protected. (*See* Doc. 50 at 78-81, 86-87). Although it is unclear from her testimony whether Johnson identified a specific individual at this time, Johnson testified that

she repeatedly clarified who was responsible for which step of administering student accounts. (*Id.* at 85-86). Thus, in light of her testimony, the context of that information would, at a minimum, disclose misfeasance or suspected misfeasance in the form of negligence by the employees responsible for managing those funds and student accounts, namely the bursar and bookkeepers tasked with maintaining student reports. *See* Fla. Stat. § 112.3187(5)(b).

### 3. Disclosures to Dr. Desamours and Russ

In or around April 2019, the investigative team discovered that students had not been invoiced timely and that the school was not timely returning unused money. (Doc. 50 at 83). Johnson testified that the timeframes are set by federal regulation. (*Id.*). Additionally, Johnson testified that she reported this issue to both Dr. Desamours and Russ more than once. (*Id.* at 83-84).

The Undersigned finds that the oral disclosures to Russ and Dr. Desamours disclosing that students were not timely invoiced and unused funds were not timely returned are protected. Although it is unclear from her testimony whether Johnson identified a specific individual responsible for the complained-of conduct, Johnson testified that she repeatedly clarified who was responsible for which step of administering student accounts. (*Id.* at 85-86). Thus, the context of that information would, at a minimum, disclose misfeasance or suspected misfeasance in the form of negligence by the employees responsible for managing those funds and student accounts, namely the bursar and bookkeepers tasked with maintaining student reports. *See* Fla. Stat. § 112.3187(5)(b). Moreover, because Johnson testified that the

timeframes are governed by federal regulation, the context of the disclosures also sufficiently implicate a suspected violation of federal law by the same employees. *See* Fla. Stat. § 112.3187(5)(a).

### 4.    Disclosures Related to the PSA's Scheduling

As noted above, the audit team investigated students at the PSA because their financial aid is handled by FMTC.  (Doc. 50 at 40).  Johnson testified that while investigating the PSA, she discovered that the students' schedules were not accurately reflecting the time or even the dates they were in the classrooms in FOCUS — *i.e.* the system used to report to the state.  (*Id.* at 84-85).  Johnson testified that she disclosed this issue to Russ and specifically identified Everly, Carmen Townsend, and Gene Sims as the responsible parties.  (*Id.* at 85).  Moreover, Johnson testified that Townsend admitted that the PSA had to "fudge student records" to match their paper schedules and that she disclosed the same to Russ.[6] (*Id.*).  Additionally, Johnson emailed Everly and Townsend a summary of her findings relating to the inaccuracies in student schedules along with examples and suggestions on how to remedy the issue.  (*Id.* at 88; Doc. 49-22).

The Undersigned finds the oral disclosure to Russ protected because she disclosed, at minimum, misfeasance or suspected misfeasance in the form of

---

[6]  In his affidavit, Mr. Everly avers that he never asked anyone to "fudge" the schedules and is unaware of anyone making such a statement.  (Doc. 33-1 at 2). Because the disclosure that the schedules are inaccurate are sufficient to disclose misfeasance or suspected misfeasance in the form of negligence, the Court need not consider this specific allegation.

negligence by Everly, Townsend, and/or Sims in failing to keep proper and accurate schedules.  *See* Fla. Stat. § 112.3187(5)(b).

The email is likewise protected as it relates to the same subject matter. Moreover, the email specifically incorporates the previous conversations and discussions on the issue because Johnson noted that the primary purpose of the email was "to recap next steps from" the meeting, including revising the information so that it is correct.  (*See* Doc. 49-22 at 1-2).  When supported by Johnson's testimony that she reviewed the schedules with Everly, Sims, and Townsend, the Undersigned finds that the email sufficiently and inherently incorporates the oral disclosures that Johnson previously made to Everly, Sims, and Townsend.  *See King v. State of Fla.*, 650 F. Supp. 2d 1157, 1163 (N.D. Fla. 2009) (finding that an email could be construed as protected because it incorporated prior protected activity).

### 5.    Disclosures Related to the PSA's Fee Disclosures

Johnson testified that as the investigation continued at the PSA, she also discovered that the PSA's fee disclosures, which describe the cost associated with attending a program, were not supported by documentation showing that any federal financial aid is appropriately administered.  (Doc. 50 at 87-88).  Specifically, Johnson testified that she discovered that students were charged for things without a dollar-amount documentation.  (*Id.*).  Johnson alleges that she specifically disclosed this issue to Russ.  (*Id.* at 88).

The Undersigned finds these oral disclosures are not protected.  While the disclosures relate to the suspected insufficiency of documentation for fee disclosures,

which, at minimum, is suspected misfeasance, *see* Fla. Stat. § 112.3187(5)(b), the Undersigned finds that the context of the disclosures even in light of the investigation as a whole would not allow a reasonable inference as to who was responsible for the complained-of issue. *See Burden*, 2012 WL 4764592, at *18. Specifically, because the identified issues involve issues other than disbursing funds and managing student accounts, the record does not contain sufficient information to determine whether there is one specific employee responsible, and, if so, who was responsible for the complained-of issue.

## II.   Whether Plaintiffs' Disclosures Were Made to Protected Persons.

Second, Plaintiffs must demonstrate that their disclosures were made to appropriate local officials. *See* Fla. Stat. § 112.3187(6). Specifically, the disclosures must be to either the superintendent, who would qualify as the chief executive officer of the district, *see* Fla. Stat. § 447.203(9) and Fla. Stat. § 1001.33, or to officials "who [are] affiliated with the violating governmental entity and [who] ha[ve] the authority to investigate, police, manage, or otherwise remedy the violation or act by the violating governmental entity," *Rustowicz v. N. Broward Hosp. Dist.*, 174 So. 3d 414, 424 (Fla. 4th DCA 2015).

Thus, the Undersigned considers whether the disclosures found to be protected above*, see* Part I.B.-C. *supra*, were made to an appropriate local official with "the authority to investigate, police, manage, or otherwise remedy the" issue disclosed. *See Rustowicz*, 174 So. 3d at 424.

### A.    Bob Brown

As Director of Internal Auditing, Bob Brown was tasked with "[e]nsur[ing] compliance with Board Rules, federal regulations, and state regulations and good business practice relating to school funds" as well as "develop[ing] and implement[ing] procedures for accountability of funds and compliance with state and District rules, regulations, and policies." (Doc. 49-3 at 2). Thus, the Undersigned finds that he is an appropriate local official to receive the oral and written reports from Russ relating to the ongoing issues concerning the distribution of Pell funds, VA awards, CareerSource funding, and other funding, *see* Part I.B.1. *supra*, because in having the authority to develop and implement procedures for accountability of funds and ensure compliance with federal regulations, Brown had the authority to "investigate, police, manage, or otherwise remedy the" issues. *See Rustowicz*, 174 So. 3d at 424. Similarly, the Undersigned finds that Brown was an appropriate local official as it relates to the PSA Audit Report and the discrepancies between the student ledgers and funding disbursements, *see* Part I.B.4. *supra*, because in having the authority to develop and implement procedures for accountability of funds and ensure compliance with federal regulations, Brown had the authority to "investigate, police, manage, or otherwise remedy the" issues. *See Rustowicz*, 174 So. 3d at 424.

### B.    Dr. Ami Desamours

As Chief Financial Officer, Dr. Ami Desamours had the authority to take remedial action to help solve issues such as the Pell grant issue, (Doc. 50 at 122-123), and was tasked with "[c]ordinat[ing], manag[ing], and oversee[ing] the District's

fiscal affairs, including . . . financial management programs," "[s]upervis[ing] the financial affairs of the District, including the handling of all funds, accounting, and reporting procedures," and "[e]nsur[ing] adherence to School District policy and state and federal law." (Doc. 49-4 at 1-2). Thus, the Undersigned finds that Dr. Desamours was an appropriate local official as it relates to Russ's oral disclosure relating to the ongoing issues regarding management of funds at FMTC, *see* Part I.B.3. *supra*, because in having the authority to supervise the handling of all funds, she had the authority to "investigate, police, manage, or otherwise remedy the" such issues. *See Rustowicz*, 174 So. 3d at 424.

Similarly, the Undersigned finds that Dr. Desamours was an appropriate local official to receive Johnson's disclosures relating to the timeframes by which federal aid must be disbursed or returned, *see* Part I.C.3. *supra*, because in having the authority to oversee financial management and ensure adherence to federal regulations, she had the authority to "investigate, police, manage, or otherwise remedy the" such issues. *See Rustowicz*, 174 So. 3d at 424.

## C.    Plaintiff Judy Johnson

As Interim Senior Direct of the Technical Colleges, Plaintiff Judy Johnson was tasked with "[d]irect[ing], coordinate[ng], and oversee[ing] the administration and supervision of all postsecondary workforce" and "[e]nsur[ing] policy compliance for the provision of federal state, and local student financial aid." (Doc 49-2 at 1). Thus, the Undersigned finds that Johnson was an appropriate local official as it relates to the PSA Audit Report, *see* Part I.B.4. *supra*, because in having oversight of

those with direct responsibility of maintaining student ledgers and the authority to ensure policy compliance for financial aid Johnson had the authority to "investigate, police, manage, or otherwise remedy the" issues. *See Rustowicz*, 174 So. 3d at 424.

### D.   Todd Everly

As to Todd Everly, in his capacity as Director of the PSA, the Undersigned finds that Plaintiffs have failed to demonstrate that he is an appropriate local official as it relates to the student schedules at the PSA. *See* Part I.C.4. *supra*. Specifically, although Johnson testified that Mr. Everly had the authority to investigate, manage, or otherwise remedy the concerns regarding the student schedules at the PSA, (Doc. 50 at 89), the job description is not part of the record. Without more, the record is insufficient to allow the Court to conclude whether this issue falls within the purview of the Director of the PSA.

### E.   Plaintiff Cheri Russ

Finally, Plaintiff Cheri Russ is an appropriate local official because Russ was tasked with looking into the issue of the Pell grant account, (*id.* at 11-12), and the lead team, of which Russ was a member, was tasked with investigating the issues relating to the student accounts further, (*id.* at 28). Thus, the District "directed and empowered [Russ] to investigate concerns," report on findings, and suggest remedial action. *See Burden*, 2012 WL 4764592, at *13-14 (finding that because the city manager empowered the plaintiff to investigate concerns and issue a report, the plaintiff is an appropriate local official); *see also Fla. Att'y Gen. Op.* 99-07 (1999)

(finding that the town's ethics commission was an appropriate local official because it conducted investigations, made reports, recommended corrective action, and imposed sanctions).

Additionally, as an internal auditor, Russ was vested with the authority to "[e]nsure compliance with internal, state, and federal accounting guidelines." (Doc. 49-1 at 1). Thus, the Undersigned finds that Russ was an appropriate local official as it relates to Pell fund and VA disbursements, *see* Part I.C.1. *supra*, because Russ had the authority to "investigate, police, manage, or otherwise remedy the" issue because was tasked with investigating precisely that. *See Rustowicz*, 174 So. 3d at 424.

Similarly, the Undersigned finds that Russ was an appropriate local official to receive Johnson's disclosures that are incorporated into Russ's internal reports related to the Pell grant issue and the timeframes required for disbursing financial aid, *see* Part I.C.2. *supra*, under either her capacity as a member of the lead team or her capacity as an internal auditor. *See Rustowicz*, 174 So. 3d at 424.

Furthermore, the Undersigned finds that Russ was an appropriate local official to receive Johnson's oral disclosures relating to the timeframes by which federal aid must be disbursed or returned, *see* Part I.C.3. *supra*, because in having the authority to ensure compliance with federal regulations, Russ had the authority to "investigate, police, manage, or otherwise remedy the" issue. *See Rustowicz*, 174 So. 3d at 424.

Moreover, the Undersigned finds that Russ was an appropriate local official to receive Johnson's disclosures relating to the inaccuracies of the PSA's FOCUS schedules, which are used to ensure compliance with federal financial aid guidelines,

*see* Part I.C.4. *supra*, because in having the authority to ensure compliance with federal regulations, Russ had the authority to "investigate, police, manage, or otherwise remedy the" issue. *See Rustowicz*, 174 So. 3d at 424.

Notably, the Undersigned disagrees with Defendant's position that because both Russ and Johnson are Plaintiffs, the disclosures they made to each other cannot be protected, (*See* Doc. 33 at 5). In *Burden v. City of Opa Locka*, the court held that one of the plaintiffs was an appropriate local official to whom other plaintiffs made protected disclosures. *Burden*, 2012 WL 4764592, *13. The Undersigned finds no factual or legal basis on which to conclude differently in this case.

In sum, the Undersigned finds that, with the exception of the email disclosure made to Everly regarding the student schedules, *see* Part I.C. 4. *supra*, each of the disclosures found to be protected above, *see* Part I.B.-C. *supra*, were made to at least one appropriate local official.

## III.   Whether Plaintiffs' Disclosures Were Made in a Protected Manner.

Third, Plaintiffs must demonstrate that their disclosures were made in a protected manner. Fla. Stat. § 112.3187(7). In this regard, the plain language of the statute differentiates between, *inter alia*, "employees and persons who disclose information on their own initiative *in a written and signed complaint*" versus those "who are requested to participate in an investigation, hearing, or other inquiry conducted by any agency or federal government entity." Fla. Stat. § 112.3187(7).

Plaintiffs contend that their disclosures were made in a protected manner because "they specifically complained of the illegal conduct to the Defendant and did so in writing." (Doc. 7 at 7). Additionally, Plaintiffs argue that the record shows that upon request they "conduct[ed] an audit into federal financial aid compliance[,] . . . and by virtue of doing so participated in an investigation." (Doc. 26 at 4 (citing 26-1 ¶¶ 8-9, 11-12, 14, 16, 20-24, 26-27, 29)).

In response, Defendant contends that "Plaintiffs cannot satisfy the third element because they cannot show they disclosed protected information in a written and signed complaint, nor do they offer anything more than conclusory allegations that they were requested to participate in an investigation." (Doc. 18 at 7). Defendant essentially contends that although Russ's affidavit alleges that written communication was sent, (*see* Doc. 26-1), Plaintiffs either failed to provide the written communication or, if they did, the communications did not include a "complaint or protected information." (Doc. 33 at 6-7). Defendant also disputes that Plaintiffs participated in an investigation under the statute because "Ms. Russ did not oversee the audit, nor was she responsible for reporting directly to upper management." (*Id.* at 7 (citing Doc. 33-1 at 2)).

Upon consideration of the entire record, the Undersigned finds that both Plaintiffs were asked to participate in an investigation or inquiry within the meaning of the statute. Specifically, Russ testified that Brown asked her to investigate the issue after the bursar contacted Russ about an overdrawn trust account. (Doc. 50 at 11-12). Similarly, Russ asked Johnson for help and then Greg Blurton formally

asked Johnson to join the investigating team.  (*Id.* at 74).  It is abundantly clear that neither Plaintiff was acting on her own initiative; they were both asked to pursue an investigation or inquiry, and they did so.

Insofar as Defendant argues that the Plaintiffs' activity was not an "investigation" under the District's usage or understanding of that term, (*see* Doc. 50 at 111), the Undersigned finds the argument to be without merit.  The statute protects those who make a disclosure as part of an investigation, hearing, or other inquiry.  Fla. Stat. § 112.3187(7).  The statute does not, by its plain language, require an investigation or inquiry to be designated by the Defendant as a formal or official investigation.  *See id.*  Moreover, at least one Florida court rejected a similar argument in *Rustowicz v. N. Broward Hospital District*, 174 So. 3d at 425 (concluding that while the defendant argued that its Corporate Compliance Office formally investigates violations, the Internal Audit Department plays a role in conducting audits with compliance implications).

Thus, even if the investigation or inquiry here was not treated internally as an official investigation by the District's definition, the activity was, at a bare minimum, an inquiry into the management of funds and financial aid, which—based on the District's job description of the Director of Internal Auditing and the job description of Auditor—ensures compliance with state, federal and District rules and regulations as it relates to accountability and practices of school funds.  (*See* Docs. 49-3 at 2; 49-1 at 1-2).  Further, Stephanie Wright, FMTC's bookkeeper, explicitly states in an email that the issues under review were "being further *investigated*."  (Doc. 49-8 (emphasis

added)).  It is clear to the Undersigned that the work Plaintiffs undertook at the request of others within Defendant's organization constituted an investigation or, minimally, an inquiry within the plain meaning of those terms sufficient to satisfy the statute.

As a result, the statute does not require Plaintiffs to show that their disclosures were made in the form of written and signed complaints to satisfy the requirements for temporary reinstatement.  *See* Fla. Stat. § 112.3187(7); *see also Rustowicz*, 174 So. 3d at 422 (noting that "if an employee is requested to participate in an investigation, hearing, or other inquiry concerning governmental wrongdoing by an appropriate official or official entity . . . and makes disclosures of wrongdoing as defined by the [FWA] during or as a result of participation, . . . the disclosures need not be by a signed complaint or on the initiative of the employee" and concluding that because the plaintiff made her disclosures as part of an investigation by the Internal Audit Department, the disclosures did not need to be in writing); *Igwe v. City of Miami*, 208 So. 3d 150, 152 (Fla. 4th DCA 2016) (concluding that the plaintiff's testimony pursuant to a subpoena by the SEC was protected because he was requested to participate in an investigation); *Bott v. Bradshaw*, No. 18-CV-80672, 2019 WL 10733141, at *5 (S.D. Fla. Jan. 24, 2019), *aff'd,* 791 F. App'x 41 (11th Cir. 2019) (finding that the plaintiff's deposition and hearing testimony were protected because it was provided in the course of a criminal prosecution); *Schuman v. Lee Cty. Bd. of Cty. Commissioners*, No. 2:14-CV-121-FTM29-CM, 2016 WL 7227540, at *6 (M.D. Fla. Feb. 4, 2016) (citing *Rustowicz*, 174 So. 3d at 422 and finding that because the

plaintiffs were asked to participate in an outside audit, their disclosures need not be signed or in writing); *Burden v. City of Opa Locka*, No. 11–22018–CIV, 2012 WL 4764592 (S.D. Fla. Oct. 7, 2012) (finding that because plaintiff was asked to participate in a confidential inquiry, his disclosures need not be made via written or signed complaints or on his own initiative).  Defendant's insistence on that point is, therefore, misplaced.

The Undersigned specifically finds that each of the disclosures found above to be protected, *see* Part I.B.-C. *supra*, were made during the course of the investigation. Accordingly, the Undersigned finds that Plaintiffs have satisfied the third prong regardless of whether the disclosures were made in signed, written complaints.

## CONCLUSION

Based on the foregoing, the Undersigned finds that both Plaintiffs made multiple protected disclosures such that temporary reinstatement is required. Specifically, Russ's oral disclosures to Brown as well as the internal auditor report, *see* Part I.B.1. *supra*, Russ's oral disclosures to Dr. Desamours, which were used as the foundation for Dr. Desamours's report, *see* Part I.B.3. *supra*, and Russ's draft audit report for the PSA, *see* Part I.B.4. *supra*, are each sufficient to establish a protected disclosure.  Additionally, Johnson's oral disclosures relating to the February 27, 2019 email, *see* Part I.C.1. *supra*, Johnson's oral disclosures to Russ, which were used in Russ's internal report, *see* Part I.C.2. *supra*, Johnson's oral disclosures to Dr. Desamours and Russ regarding invoicing students and returning

unused funds, *see* Part I.C.3. *supra*, and Johnson's oral disclosures to Russ related to the PSA scheduling, *see* Part I.C.4. *supra*, are each sufficient to establish a protected disclosure.

Accordingly, the Undersigned **RESPECTFULLY RECOMMENDS** that:

1.    Plaintiffs' Motion for Temporary Reinstatement Under F.S. § 112.3187(9)(f) (Doc. 7) be **GRANTED**.

2.    The Presiding United States District Judge order Defendant to temporarily reinstate Plaintiffs to their former positions or to equivalent positions, pending the final outcome of this action.

**RESPECTFULLY RECOMMENDED** in Chambers in Ft. Myers, Florida on February 10, 2021.

Mac R. McCoy
United States Magistrate Judge

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1. A party wishing to respond to

an objection may do so in writing fourteen days from the filing date of the objection.

Any written objections or response thereto may not exceed thirty pages inclusive of

all parts.  The parties are warned that the Court will not extend these deadlines or

page limitations.  To expedite resolution, parties may also file a joint notice waiving

the fourteen-day objection period.

Copies furnished to:

Counsel of Record
Unrepresented Parties